[See Case No 15,349.]

---

## Case No. 15,349.

### UNITED STATES v. HENNING.

[4 Cranch, C. C. 645.] [1]

Circuit Court, District of Columbia. Jan. 16, 1836.

#### SELLING FREE NEGROES—KIDNAPPING.

1. In an indictment under the 17th section of the penitentiary act [4 Stat. 450] for the District

[1] [Reported by Hon. William Cranch. Chief Judge.]

of Columbia, it is not necessary to aver that the defendant was a "free person."

2. That section does not apply to negroes kidnapped out of the district, and brought within it.

3. Quære, whether it applies to the seizure or seduction of any free negro or mulatto, not a resident of the district.

This was an indictment under the 17th section of the penitentiary act for the District of Columbia, of the 2d of March, 1831 (4 Stat. 450), by which it is enacted: "That if any free person shall, in the said district, unlawfully, by force and violence, take and carry away, or cause to be taken and carried away; or shall, by fraud, unlawfully seduce, or cause to be seduced, any free negro or mulatto from any part of the said district to any other part of the said district, with design or intention to sell or dispose of such negro or mulatto, or to cause him or her to be kept or detained, as a slave, for life, or a servant, for years, every such person so offending, his or her counsellors, aiders, and abettors, shall, on conviction thereof, be punished by fine, not exceeding five thousand dollars, and imprisonment and confinement to hard labor in the penitentiary, for any time not exceeding twelve years, according to the enormity of the offence."

The first count charged that the defendant [Washington Henning] did, with force and arms, unlawfully, by force and violence, take and carry away, and cause to be taken and carried away, a certain free mulatto boy named Thad. Key, from a certain part of the said district, to wit, from the shore of the Potomac river, in the city of Washington, in the said county and district, to a certain other part of the said district, to wit, to the Pennsylvania avenue, in the said city, in the county and district aforesaid, and to the house of one W. R. in the said county, and to divers other parts of the said county and of said district, with the design and intention, then and there, to sell and dispose of said free mulatto, and to cause him to be kept and detained as a slave, for life, against the form of the statute, &c. The second count charged that the defendant, "with force and arms, did unlawfully, by fraud, unlawfully seduce, and cause to be seduced a certain free mulatto boy," &c., as in the first count, "from a certain part of the said district," to wit, &c., "to a certain other part of the said district," to wit, &c., "with the design and intention," &c., as in the first count.

The defendant demurred to the indictment, because it did not aver that the defendant was a "free person," and Mr. W. L. Brent, his counsel, contended that as the word "free" was not inserted in the other sections of the act, congress must have had some reason for inserting it in this section which did not apply to the other sections; which reason could only be that they intended to confine it to free colored persons; for the word "free" is seldom applied to a white man.

Mr. Key, for the United States, contra, contended that the only use of the word "free," in this section, was to prevent it from being applied to slaves, as in the fourth and fifth sections of the act, where it is also used for the same purpose; and that, in each of those sections the word "free" became unnecessary by the addition which was made to the last clause of the act, namely, "that this act shall not be construed to extend to slaves;" but it was not thought worth while to strike the word out of those sections; and it would be a strange construction to say that congress intended to punish a free colored person for an offence which is rarely committed by that class of persons, and not to punish a free white man for the same offence, which was almost universally committed by persons of that description.

THE COURT (THRUSTON, Circuit Judge, doubting,) was of opinion that the seventeenth section of the act was applicable to free white persons as well as to free colored persons; and that it was not necessary in the indictment to aver that the defendant was a "free person," especially as he is therein called "yeoman."

The defendant thereupon had leave to withdraw the demurrer and plead the general issue.

At the trial of that issue, the defendant's counsel moved the court to instruct the jury, "that if they believe, from the evidence, that the boy was removed from a place from without the District of Columbia, to a place within it, in the vessel of the defendant, and there taken from said vessel and carried to another place in said district, and offered for sale, with the criminal intent as stated in the indictment, then the jury must acquit the defendant."

THE COURT (MORSELL, Circuit Judge, doubting,) refused to give the instruction; but said that if the verdict should be against the prisoner, they would hear a motion for a new trial, upon this question.

The jury found the defendant guilty on the second count, and his counsel moved for a new trial, on the ground of the court's refusal to give the instruction as prayed; and contended that the seventeenth section of the penitentiary act, was only applicable to an original seizure or seduction within the district; not to the case where the kidnapping was in one of the states, and the kidnapped person brought into this district by a continuation of the same force and violence, or seduction.

Mr. Key, for the United States, contended that the case was exactly within the words of the statute; and equally within its spirit.

THRUSTON, Circuit Judge. This is an indictment for attempting to sell a free negro for a slave, contrary to the provision of the seventeenth section of the penitentiary law. If the court should be of opinion that the argument, in favor of arresting the judgment,

drawn from the inapplicability of the law to the case of free negroes brought from another state, is invalid for any reasons as yet presented to the court, there is still a further reason, founded on another view of the clause in question, which appears to me very strong. In the construction of a written law, it is necessary, to understand its true import, to gather the intention of the framers of the law, not only from what they have done, but also from what they have not done; for example, from the consideration of the seventeenth section of the penitentiary law, it is clear that the selling of a free negro, without removal by force or violence, or without seduction, from the place where such free negro may be; for instance, if a man designing to perpetrate such a villanous act, were to take a negro-buyer to some place or spot where his intended victim may be found, without removing him, it is not questioned but that such a case is not criminal under the said seventeenth section. Now, is not this surprising? Is not the guilt the same as if the free negro was removed from the said place, say one hundred or any less number of feet or yards by force, &c.; or seduced thither? Can any reason be assigned, but one, for this? Is it possible that all the guilt consists in the removal? Can any man of reflection say this? Then why is this apparently absurd and senseless distinction made, unless there be at the bottom something not discernible at the surface? Could any thing have been more easy or more simple, if congress did really design to punish the act of attempting to sell a free negro for a slave, than in few words to have enacted, "that whoever shall, in the said district, attempt to sell a free negro for a slave, within this district, shall be punished so and so?" Surely it did not require all this long paragraph of the seventeenth section to effect this end. Then there must have been some very peculiar and more limited object in view. Now what could this have been? For, if we cannot discover some rational cause for all this, we must mark the provision of the law, as it stands, with the impress of nonsense and absurdity. Would it not be more becoming and more reasonable to endeavor to find out some design or purpose, in this seemingly strange enactment; in which case we shall relieve the law from those imputations. Now, in casting it about in my mind to account for this inconsistency, I have discovered, I think, that there is no inconsistency at all; and that the framers of the law meant really to provide only for the cases of an attempt to sell by removal by violence or seduction; in which case my other reasons for believing that the law did not design to embrace foreign free negroes, is fortified. Now, it must be observed that it would be a difficult matter to sell a free negro at his own domicil or place of abode, or even in the public highways, or at any place in which he may be ordinarily found; because every such free negro has friends or relatives who would most probably detect seduction, if attempted, or resist violence, and expose it to public observation so as to prevent the consummation of such a nefarious crime; but if he could be enticed or forced to some receptacle of negro-dealers, or some retired spot where the intended victim was not known, there would be imminent danger of such consummation. If this be not a probable solution of the difficulty, then what is? Now an imported free negro, being a stranger, has neither friends nor relations, (unless by accident in some special cases,) and therefore is as much exposed to fraud in one place as another; and the violence or seduction may have been perpetrated and consummated before the arrival of the intended victim within our borders.

For these reasons, in addition to others urged before, I am strongly inclined to believe that the legislature meant to make provision only for the district free negroes, leaving those of other states to be taken the same care of by their governments as congress has thought proper to bestow upon those of our territory; and which governments have powers to provide for the case of abduction of free negroes from within their limits, or from one place to another, within the same, by force or seduction, as congress has within our district.

Another reason, too; our district is small, and one hour is sufficient to transport a free negro into a slave state on either side of the Potomac. The danger, therefore, was great to those persons; and, hence, I suppose the severe penalty for such an attempt provided by law. Not so with negroes of other states, who, I am firmly of opinion were not within the contemplation of the framers of the law, nor, in my opinion, within the statute, unless we give a construction to it pregnant with absurd results.

The other judges took time to consider till Saturday, January 16th, 1836.

CRANCH, Chief Judge. The motion for a new trial is grounded upon the refusal of the court to give the instruction prayed by the prisoner's counsel; which instruction the court ought not to have given, unless the circumstance, that the free boy had been brought into this district in the defendant's vessel, takes the case out of the statute. The count, in the indictment upon which the defendant has been convicted, states that the defendant did, by fraud, unlawfully seduce the free mulatto boy from a certain part of this district, (naming it,) to a certain other part of this district, (naming it,) with the design and intention to sell and dispose of the boy to a certain person, (named,) as a slave for life. And the statute says: "That if any free person shall, in the said district, by fraud, unlawfully seduce any free negro or mulatto from any part of the said district, to any other

part of the said district, or to any other place, with design or intention to sell or dispose of such negro or mulatto, as a slave for life; every such person so offending shall, on conviction thereof, be punished by fine, not exceeding $5,000, and imprisonment and confinement to hard labor, in the penitentiary, for any time not exceeding twelve years." The case stated in the indictment is the exact case stated in the statute; and the court must refuse the new trial, unless the defendant can show that his case is clearly out of the spirit of the act.

The spirit of the act is to punish the intention to sell a free colored person as a slave, when that intention is manifested by the overt act of removing him by force or fraud from any part of the district, to any other part of the district, or to any other place. The intent was not only to prevent the sale of free negroes and mulattoes, resident in the district, by persons resident in the district, but to throw an obstacle in the way of kidnappers who should have seized free negroes in any of the states, and who should be passing through the district with their prey. I say this was the intent of the statute, because the words of the statute comprehend both cases; the parties in both are in æquali delicto; and both, classes of free colored persons are equally entitled to protection.

For some time previous to the passing of this act, we know that there were rumors of kidnappers passing through this district from the state of Delaware, and the eastern shore of Maryland, to the Southern states, with their booty; and applications had been made, from time to time, to the court and to the judges, to stop them by writs of habeas corpus, and injunction, which, when granted, only served to hasten their departure. This statute furnished the ground of issuing a warrant to arrest the parties in the first instance. Before this statute there was no law to which they were amenable here, or by which their flight could be arrested. The act of kidnapping was not committed here; the mere intent to sell was not punishable anywhere; there might be no attempt to sell here; and if there should be, it was not the offence which congress intended to punish. The offence intended to be punished by the 17th section of the act, was the having a free negro in possession with an intention to sell him here or elsewhere, provided that intention should be accompanied here by the overt act or acts of coercion or control, mentioned in the statute. If it had enacted that every person who should bring into this district a free negro or mulatto with intent to sell him as a slave, it would have excluded an intention to sell, formed after he arrived here; and would also have excluded the intention to sell resident free negroes and mulattoes. If it had enacted that whoever should, "in the

said district, attempt to sell a free negro as a slave within this district, should be punished." &c., it would have excluded a class of cases of equal atrocity, and in my opinion equally within the spirit of the act, and which are now within the letter of the act; namely, the cases of kidnappers found, with their prey, in the district, or on their passage through it, having no intent to sell it in the district, and not attempting to sell it in the district, but intending to spirit it away into some distant slave-holding state, where the claim of freedom would be lost by the difficulty of procuring the evidence to support it. The act does not purport to punish the attempt, eo nomine, but it punishes certain acts done in the district, with intent to sell, either in the district or elsewhere. The words of the statute are very peculiar; and are exactly adapted to the supposed case, as well as to other cases within the same mischief. If the statute had been confined to kidnappers who should bring their booty from a place out of the district, it would have excluded acts of kidnapping within the district; but the words now include both. If the statute had been confined to the attempt to sell in the district, it would not have reached acts done in the district with intent to sell elsewhere, and it would have left the case open to much litigation upon the question, what acts in the district would amount in law to an attempt to sell. If the statute had merely applied to kidnappers passing through the district with their victims, the offence would not be complete until they were out of our jurisdiction; hence, in order to make it complete within the district, it required a removal from one part of the district to another; and in order to provide for the case of passing through the district, it says, from any part of the district to any other place.

Thus the act punishes the kidnappers who bring the free negro into this district for sale, here or elsewhere: for he cannot well be brought into the district without being removed from one part of the district to another part of the district. If he is brought to the city of Washington by water, he enters the district below Alexandria, and is removed from the district line to Washington. If he passes through the district without stopping, he is removed from one part of the district to another place. If kidnapped out of the district, it is hardly possible that he should be sold in the district without having been removed from one part of the district to another part thereof; it could only happen by the kidnapper's bringing him up just to the line of the district, and selling him there, without passing over it. If kidnapped within the district, it would rarely happen that he could be sold within the district, without having been removed by the kidnapper from one part of the district to another. If such a case could happen, although it would not be within the words of the stat-

ute, yet it would be within its spirit; and it would be more certainly within the rules of construction of statutes, to say that it should be construed to be within the letter, than that the other cases, provided for by the express words of the statute, should not be within its spirit. Neither the act of kidnapping, (that is, the original seizure of the free negro,) nor the actual sale, is expressly within the provisions of the statute; but no argument against the validity of the statute can be drawn from that circumstance; for it cannot be inferred that congress meant to do nothing, because they have not done every thing. It appears to me that they only intended to legislate in regard to kidnappers; and principally in regard to foreign kidnappers bringing their spoils here, in transitu, and that their omission to provide for other cases, cannot derogate from what they have done. No rule of construction will justify us in saying that the omission to provide for cases equally within the spirit of an act, will exclude those which are expressly provided for by it. If this act has not provided for the punishment of the kidnapper in the district, who shall have sold his victim without having removed him from one part of the district to another part thereof; or, of the importer of a free negro, with intent to sell him as a slave, both of which cases are as much against the spirit of the act as any of those which it has provided for, we cannot thence infer that congress did not mean to provide for those cases which are within both the letter and the spirit of the act. If congress chose to make the overt act of intention consist in the removal of the free negro from one place in the district to another place, in or out of the district, rather than in the importation, I cannot see how it makes void the express enactment of the 17th section of the statute; or why the omission of congress to provide for the punishment of the offence of actually selling a free negro or mulatto as a slave, (when the case of selling was already provided for by the Maryland act of 1796, c. 67, in force in this part of the district,) should annul the express words of that section. The object and intent of the act is the protection of free colored persons, and to throw an obstacle in the way of their being sold as slaves. Congress are as much bound to protect strangers and sojourners in this district, as to protect those persons who are resident herein. This principle applies as strongly to colored strangers, and sojourners, as to colored residents. Why, then, should we apply to one class, only, the protection which congress has, in words, extended to both? If we have a right to apply the protection to either, we have a right, (and in a case made out within the words, are bound,) to apply it to both.

Can it be said that congress cannot punish an act done in the District of Columbia, with a criminal intent, if that intent be to do a criminal act out of the district? Suppose an insurrection of slaves in Virginia, and that the free negroes of Maryland should assemble and arm themselves, with intent to go into Virginia and aid the insurgents; would it not be in the power of congress to forbid them to pass through the District of Columbia, or to purchase arms or provisions therein with that intent? Suppose there were in Bladensburgh, wagon-loads of inflammatory libels, calculated and intended to be distributed in Virginia with intent to excite insurrection; would not congress have authority to pass a law prohibiting their transportation through the district, with that intent? Cannot congress prohibit, by law, the purchase of arms in the District of Columbia, with intent to commit murder or robbery in Virginia? If congress have a right to pass laws prohibiting those acts to be done in the district, they have a right to affix penalties and punishment to the violation of those laws; and they are not limited in the degree of punishment, if it be not "cruel and unusual" within the meaning of the 8th article of the amendments of the constitution. If, then, congress may punish some acts done in the district, by persons passing through the district, with intent to commit a crime out of the district, what other acts, done in the district, by such persons, with the like intent, may they not punish? Where shall the line be drawn? It seems to me that no such line can be drawn; and that congress has power to pass a law for the punishment of any act done in the district, with intent to commit a crime out of the district.

If it should be said that the original criminal intent was formed and to be consummated in Virginia, and that the acts, done in the district, were done with that original intent, which was continued uninterruptedly through all those acts, yet it seems to me that the case is not thereby taken out of the statute; for it still remains true, that those acts were done with the intent stated in the indictment. It does not seem to me like the case of the thief who had committed larceny in Maryland, and who was found here with the stolen goods in his possession; nor like the case of the forged papers inclosed in an envelope in one of the states, and forwarded by mail to this district; in which cases the court decided that the offences charged, namely, larceny, and the uttering of forged papers, were not committed in this district; for there was no question in those cases whether congress might not have made a law punishing the thief for bringing the stolen goods into this district, or for removing them from one part of the district to another, with intent to appropriate them to his own use, or to sell them in some place out of the district. Nor, in the case of uttering forged papers, was there any question whether congress had not the power to prohibit and punish a person for using the mail for knowingly transporting forged papers with intent to

·defraud any person; or to punish any act done, in the district, with a like criminal intent. If, at the time when the case of larceny was tried, there had been such an act of congress as is above suggested, and the thief had been indicted under it, and the court had decided that congress had no power to pass such an act, the case would have been in point. So also in the case of uttering the forged papers. But as the cases existed, they seem to me to bear no resemblance to the present case. If this defendant had, previous to the penitentiary act, been indicted for kidnapping the free negro here, and the prosecutor had proved that the defendant kidnapped him in Virginia, and brought him here by force or fraud; then the question would have occurred here, as it did in the case of larceny in Maryland, whether the offence would not continue and accompany the kidnapped person into this district, so as to make it a case of kidnapping here; and the court must have decided, as they did in the case of the larceny committed in Maryland, that the offence was complete in Virginia, and that he could not be punished here for the offence of kidnapping which was complete there. But if, as before mentioned, congress, by law, made it penal for the thief, who had stolen goods in Maryland, to bring them into the district, with intent to appropriate them to his own use, or for sale, and he had been indicted and convicted under that law, the court must have given judgment against him; for it was a new and different offence, committed under a different jurisdiction. So, in the present case, although the defendant cannot be convicted and punished here for the kidnapping in Virginia, he may be convicted and punished for the new offence committed here under a different jurisdiction.

The offence of forcibly or fraudulently transporting, or carrying out of the district, any free negro or mulatto, knowing him to be free, and the offence of knowingly transporting or carrying out of the district any negro or mulatto entitled to freedom at a certain age, and selling him out of the state, as a slave for life, or for a longer term than he has to serve by law, were already provided for by the Maryland statute of 1796, c. 67, § 15, which was adopted by the act of congress of the 27th February, 1801 (2 Stat. 103). Neither of these offences, however, could be complete until the parties were out of our jurisdiction, and, therefore, could seldom be punished. The offence of importing into this district any free negro or mulatto, or any person bound to service for a term of years only, and knowingly selling him as a slave for life, or for a longer term than he was by law bound to serve, was also provided for by the same Maryland statute (section 16). By that statute, each of those offences was punishable by a fixed and absolute penalty of eight hundred

dollars; or by confinement to labor for a period not exceeding five years if the penalty should not be paid, or secured to be paid, within thirty days after judgment. There was, therefore, no necessity for congress to legislate in regard to those offences; and no argument can be drawn from their having omitted, in the penitentiary act, to provide for what was already provided for; unless it should be supposed that the punishment by fine and imprisonment and labor in the penitentiary, (which may, at the discretion of the court, not exceed a fine of one cent, and imprisonment of one day,) is more severe than an unmitigable penalty of eight hundred dollars, and confinement to labor for a period not exceeding five years, if the penalty should not be paid or secured in thirty days after judgment. I confess it might be difficult to say which chance would be preferred; but I should incline to think that a punishment open to all equitable and mitigating circumstances would be preferable to an absolute penalty of eight hundred dollars, accompanied by the alternate confinement to labor; so that whatever weight the argument can have, it must be small, and, in my opinion, ought not to make void the positive and express provisions of the statute.

I think the case stated in the second count, upon which the defendant was convicted, is exactly in the words and spirit of the seventeenth section of the act upon which the prosecution is founded; that the instruction was properly refused, and, therefore, that the new trial ought not to be granted.

I would observe, also, that there are other objections, to the prayer, which justified the court in rejecting it; but which have not been noticed in the argument. It does not state that the defendant brought the free negro to the district; it states that he was removed from a place without the district to a place within the district in the defendant's vessel; but whether he came as a hired seaman, or in any other capacity, does not appear; nor does it appear that the defendant had formed any intent to sell him until after he was landed. My opinion, however, is not founded upon either of these objections; but upon the ground above stated.

THRUSTON, Circuit Judge. As this case depends entirely on one section of the act of congress, namely, the seventeenth section of the penitentiary act, and the fate of the prisoner depends upon the proper construction of that section, it behooves us, on account of the terrible penalty inflicted on its transgressor, to look at it in every point of view which can aid us in unravelling its meaning. Now this section prohibits, &c., (here the judge read it.) Let us suppose the case of an actual sale of a free person so carried, &c.; what would be the result? This act provides no punishment for the

sale, but for the attempt. The Maryland law provides a punishment for the actual sale. Could you punish the seller under both laws because a sale necessarily includes an attempt? If not, under which? Would it be optional with the prosecutor? But the Maryland act punishes the offence of selling with not a tenth part of the severity which the act of congress does the mere attempt to sell. It is true the seventeenth section leaves it discretionary with the judges to impose a less punishment than the maximum fixed in the act; but as this depends on the arbitrary discretion, and the mere caprice of judges, whose moderation or severity will be in proportion to their sense of the turpitude of the crime, it is no argument to show that the seventeenth section inflicts a less punishment than the Maryland act, even for the consummation of the crime. I state this only to show another strange inconsistency in the law; to punish with unexampled severity an attempt to commit a crime, which, if consummated, is subjected to a punishment much more mild and lenient.

But, another strong view of the case has occurred to my mind, since my last imperfect sketch of my opinion of the true construction of the said seventeenth section; and it is this. Suppose the prisoner or traverser, in the case before us, had, instead of attempting to sell in the district, traversed the district with the boy, after landing him at the wharf, and carried him immediately on to Virginia, whence he brought him, how would the matter have stood then? Here would be the case of seduction begun in Virginia, and the attempt to sell also in Virginia: the whole offence perpetrated in Virginia, except the mere transit through the district, which is free to every citizen of the United States, and the world even; and still this case would be within the words of the law; but is it possible that it can be within its spirit? Here is no crime committed against the law, except the mere passage through the district; nay, can it be within the spirit of the act? Was it competent for congress to punish the act done out of their jurisdiction? not only consummated, but actually commenced out of their jurisdiction? Can it be doubted that if the jury had been instructed that if the intent and seduction were conceived and commenced in Virginia, the traverser was not within the statute, they would not have acquitted him? Because I put it to the candor of my brother judges to say that there was any more evidence that the seduction began here, than that it did in Virginia: is there a doubt that there was a preconceived intent, when the boy was put aboard the vessel, before its arrival at our shores? or even when he was enticed from Virginia, to bring him here to sell him? What evidence was there that this intent was suddenly conceived after the landing of the boy at the wharf?

On the contrary, was not the evidence in favor of the seduction having commenced in Virginia as well as the intent. From the smallness of the boy he was no use aboard; there was no evidence that there was any obvious purpose of taking him aboard as a hand, (not that I remember.) I have no doubt, from the whole evidence, that both the intent and seduction were conceived and commenced in Virginia; and if so, the offence is not within the jurisdiction of this court, as Plympton's Case.

I return to the supposed case of the boy's having been taken through the district and attempted to be sold in Virginia, from whence he was brought. His case is, nevertheless, within the words of the statute. But is it within the spirit? It cannot be; for congress could not, constitutionally, punish such an act; both the commencement and consummation of the offence, if it be one, would take place out of the jurisdiction of congress over such subjects; then all the offence, in such case, would be the passing through the district. Why, can it be imagined that if I pass through this district, with an intent to commit even murder or robbery, and attempt both, beyond the district, that congress could punish it, because, in passing through their territory, I had such an intent in my mind? They surely could do that as lawfully and constitutionally as they can punish me for passing through their territory with a free person, seduced from Virginia, and attempting to sell him after getting back to Virginia; yet this case, according to the opinion of Mr. Key and the Chief Judge, is within the law.

I state these various views of the case, to show how unsafe it is to depend on the words of a statute, if when you come to consider the cases that come within the words, there are a number which, if taken to be within the spirit also, would lead to the most absurd consequences; such as the instances I have stated in this, and in my former remarks. I say, again, that congress are not competent to punish any offence within the jurisdiction of state tribunals, perpetrated in any of the states; they belong to state sovereignties to punish. Then it is clear they cannot punish one who seduces a slave, or brings him, under any pretence or circumstances from Virginia, and passes through this district with him, and attempts to sell him, in Virginia; no more can they do so, where the person is a Virginian, seducing a free boy from that state, and entertaining the intent there; and brings him to this district, and attempts to sell him, with the intent so conceived in Virginia before his arrival within our jurisdiction. The essence of the offence, the seduction and intent, took place out of this jurisdiction, and therefore there is only the act of attempting to sell, without the seduction and intent; which, if conceived and ex-

ecuted in Virginia, is no violation of the statute; and if the jury had been so instructed, they could not, from the evidence before them, have convicted the traverser; but for the reasons given in this and my former opinion already given, I am satisfied that the act cannot, consistently with any reasonable construction of it, apply to citizens of other states, bringing such free person from such states, by force or seduction, and attempting forthwith to sell him here, and therefore I should arrest the judgment: but at all events it seems clear to me that a new trial ought to be granted.

MORSELL, Circuit Judge, said that he had not written any argument, but was of opinion, that if the seduction and intention to sell commenced in Virginia, and continued until the arrival of the boy in the district, the case was not within the spirit of the statute; which he thought was confined to forcible seizures, or fraudulent seductions commenced and completed in the district. But, as the prayer of the prisoner's counsel for the instruction to the jury, did not state the fact that, in this case, the seduction and intent to sell, were formed in Virginia, or anywhere else out of the district, he was of opinion that a new trial ought not to be granted.

The prisoner was sentenced to one year's imprisonment and labor in the penitentiary.

